

1996 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

9-9-1996

# Patriot Party Allegheny v. Allegheny Co. Dept of Elections

Precedential or Non-Precedential:

Docket 95-3385

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1996

Recommended Citation

"Patriot Party Allegheny v. Allegheny Co. Dept of Elections" (1996). *1996 Decisions.* Paper 68.
http://digitalcommons.law.villanova.edu/thirdcircuit_1996/68

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1996 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

No. 95-3385


PATRIOT PARTY OF ALLEGHENY COUNTY

v.

ALLEGHENY COUNTY DEPARTMENT OF ELECTIONS;
MARK AS DIRECTOR OF THE ALLEGHENY COUNTY
DEPARTMENT OF ELECTIONS

THE PATRIOT PARTY
OF ALLEGHENY COUNTY,

Appellant.


On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil Action No. 93-cv-01884)


Argued March 28, 1996

Before: GREENBERG, ROTH and ROSENN, Circuit Judges

(Opinion Filed    September 9, 1996)

Cornish F. Hitchcock, Esq. (Argued)
David C. Vladeck, Esq.
Public Citizen Litigation Group
1600 20th Street, N.W.
Washington, D.C.  20009-1001


Sarah E. Siskind, Esq.
Davis, Miner, Barnhill & Galland
44 East Mifflin Street
Suite 803
Madison, Wisconsin  53703


William A. Weiler, Jr., Esq.

Weiler & Weiler
4762 Liberty Avenue
Pittsburgh, PA  15224

Jonathan B. Robison, Esq.
712 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219

        Attorneys for Appellant

Ira Weiss, Esq.
County Solicitor
Allan J. Opsitnick, Esq. (Argued)
Assistant County Solicitor
Office of Allegheny County Law Department
445 Fort Pitt Boulevard
300 Fort Pitt Commons Building
Pittsburgh, PA 15219

        Attorneys for Appellees

OPINION OF THE COURT


ROTH,  Circuit Judge

        The Allegheny County Patriot Party ("Party") alleges that two Pennsylvania election laws have prevented it from nominating its chosen candidate for school director, in violation of the Party's First and Fourteenth Amendment right of free association as well as its Fourteenth Amendment right to equal protection of the laws.  The challenged laws, 25 Pa. Stat. Ann. §§ 2936(e) and 2911(e)(5), prevent a minor political party from "cross-nominating" a candidate for political office when that candidate has already been nominated for the same office by another political party.  The Party seeks declaratory and injunctive relief pursuant to 42 U.S.C. § 1983 to prevent enforcement of the challenged Pennsylvania laws in future elections.

        We hold that the challenged sections of Pennsylvania's election code violate the Patriot Party's right of free association and its right to equal protection of the laws.  The state election laws severely burden the Party's right to choose its standard-bearer and build its political organization, without supporting a compelling countervailing state interest.  They also facially discriminate against minor political parties and their supporters.  We will therefore reverse the judgment of the

district court, enter judgment for the Patriot Party, and remand the case for further proceedings consistent with this opinion.

The district court properly asserted subject matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(3)-(4). We have jurisdiction of the district court's final order pursuant to 28 U.S.C. § 1291.

I.

The facts of this case are not in dispute. The Pennsylvania Election Code explicitly allows candidates for certain local offices, including school director, to be nominated by both major parties. 25 Pa. Stat. Ann. § 2870(f). Pursuant to the Code, several candidates for school director in Pennsylvania's North Allegheny School District sought the nominations of both the Democratic and Republican parties in the May 1993 municipal primary. Three candidates were nominated by both major parties to run in the November 1993 general election for the four available four-year terms. In addition, Michael Eshenbaugh sought the nomination of both major parties for the one available two-year term. Although Eshenbaugh was nominated by the Democratic Party, he lost his bid for the Republican nomination.

In July 1993, the Patriot Party of Allegheny County, a minor political party, see 25 Pa. Stat. Ann. §§ 2831(a)-(b) and 2872.2, nominated four candidates for school director in the North Allegheny School District. Eshenbaugh was one of the Patriot Party nominees, and he willingly accepted his nomination by the Party. Two sections of the Pennsylvania Code, however, voided the Patriot Party's nomination of Eshenbaugh, because he had already sought the nomination of the major political parties. By letter dated August 10, 1993, Mark Wolosik, Director of the Allegheny County Department of Elections ("the Department"), explained that because Eshenbaugh had previously filed nomination petitions seeking the nominations of the major parties, Pennsylvania law prohibited him from filing nomination papers to run on a minor party ticket. Wolosik cited 25 Pa. Stat. Ann. § 2936(e) as the authority for his ruling, without noting that § 2911(e)(5) also prevented Eshenbaugh's dual candidacy. See supra note 1.

The Patriot Party challenges the constitutionality of 25 Pa. Stat. Ann. §§ 2936(e) and 2911(e)(5) as applied in this case to prevent the Party from nominating Eshenbaugh. Because both parties agreed that the facts were undisputed, the district court treated the Department's motion to dismiss and the Patriot Party's motion for summary judgment as cross-motions for summary judgment. See Patriot Party v. Allegheny County Dep't of Elections & Mark Wolosik, No. 93-1884, slip op. at 2 n.1 (W.D. Pa. June 7, 1995) (hereinafter Patriot Party). The district court denied the Patriot Party's free association and equal protection claims, holding that the state's legitimate interest in regulating its ballot justified the restraints that the election code placed on minor parties. Patriot Party, slip op. at 11.

Our review of the district court's grant of summary judgment is plenary. Wheeler v. Towanda Area School Dist., 950

F.2d 128, 129 (3d Cir. 1991); Public Interest Research Group of N.J., Inc. v. Powell Duffryn Terminals, Inc., 913 F.2d 64, 71 (3d Cir. 1990), cert. denied, 498 U.S. 1109 (1991). We apply the same test the district court should have applied initially. Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976), cert. denied, 429 U.S. 1038 (1977).

## II.

Before reaching the merits of the Patriot Party's challenge, we must determine whether this controversy is justiciable. Eshenbaugh, running on the Democratic ticket only, won the two-year term vacancy for school director in the November 1993 election. Patriot Party, slip op. at 3 n.3. As a result, we must ensure that this case has not been mooted by the fact that the election in question has taken place and by Eshenbaugh's success in that election. "An action becomes moot when '(1) there is no reasonable expectation that the alleged events will recur . . . and (2) interim relief or events have completely eradicated the effects of the violation.'" Zellous v. Broadhead Assoc., 906 F.2d 94, 100 (3d Cir. 1990) (quoting Ames v. Westinghouse Electric Corp., 864 F.2d 289, 291-92 (3d Cir. 1988)).

Although the 1993 election has come and gone, the district court found that "[i]f it were permitted to do so, [the Patriot Party] would nominate a candidate who, like Mr. Eshenbaugh, has sought the nomination in the primary election by both major parties and who has succeeded in winning the nomination of one of those parties." Patriot Party, slip op. at 5. Since this case was filed, the Patriot Party has also challenged the Department's decision to reject the Party's cross-nomination of a candidate who was nominated by both the Democratic and Republican parties. See Patriot Party of Allegheny County v. Wolosik, Civ. No. 95-1175 (W.D. Pa.). Although this latter controversy differs from our factual scenario, it indicates the likelihood that cross-nominations by third parties will continue to vex the Pennsylvania Department of Elections and the courts.

Because cross-nominations by minor political parties are still prohibited by the Pennsylvania election laws, this case is capable of repetition, yet evading review. Norman v. Reed, 502 U.S. 279, 287-88 (1992) (citing Moore v. Ogilvie, 394 U.S. 814, 816 (1969)). There is "every reason to expect the same parties to generate a similar, future controversy subject to identical time constraints . . .." Id. We hold therefore that this case is justiciable.

## III. Freedom of Association

States have broad power to regulate the time, place, and manner of elections, but they must do so within the limits established by the First and Fourteenth Amendments to the U.S. Constitution. Eu v. San Francisco County Democratic Cent. Comm., 489 U.S. 214, 222 (1989). The protection of the First and Fourteenth Amendments extends to partisan political organizations as well as to individuals. Id. at 224 ("It is well settled that partisan political organizations enjoy freedom of association protected by the First and Fourteenth Amendments") (citing

Tashjian v. Republican Party of Connecticut, 479 U.S. 208, 217 (1986); Elrod v. Burns, 427 U.S. 347, 357 (1976) (plurality opinion)). Thus, a political party, such as the Patriot Party, may challenge state regulations that allegedly burden its fundamental constitutional right to freedom of association. See, e.g., Eu, 489 U.S. 214; Tashjian, 479 U.S. 208.

Although no dispositive precedent explicitly discusses cross-nomination, a number of Supreme Court decisions touch upon the rights of political parties. These cases set out a general framework for analyzing constitutional challenges to state election laws. Norman, 502 U.S. at 288-89; Anderson v. Celebrezze, 460 U.S. 780, 788 (1983). The Court generally applies a fact intensive balancing test that weighs the burden that the state election law places on a political party against the state's asserted justification for the law.

To determine whether a state election law violates the U.S. Constitution, we first examine whether the challenged law burdens rights protected by the First and Fourteenth Amendments. Eu, 489 U.S. at 222. If the law does burden protected rights, we must gauge the character and magnitude of the burden on the plaintiff and weigh it against the importance of the interests that the state proffers to justify the burden. Norman, 502 U.S. at 288-89; Anderson, 460 U.S. at 789. We examine not only the legitimacy and strength of the state's proffered interests, but the necessity of burdening the plaintiff's rights in order to protect those interests. Anderson, 460 U.S. at 789. If the burden on the plaintiff's rights is severe, the state's interest must be compelling and the law must be narrowly tailored to serve the state's interests. Norman, 502 U.S. at 289; Eu, 489 U.S. at 222; see also Twin Cities Area New Party v. McKenna, 73 F.3d 196, 198 (8th Cir. 1996), cert. granted, 116 S. Ct. 1846 (1996); Swamp v. Kennedy, 950 F.2d 383, 385 (7th Cir. 1991), cert. denied, 505 U.S. 1204 (1992)). We proceed, therefore, by first examining the burden that the challenged Pennsylvania election laws place on the Patriot Party's constitutional rights. We then consider the justification that Pennsylvania has proffered to support the imposition of this burden.

A. Burden on the Patriot Party

The Patriot Party alleges that the State's prohibition of cross-nomination by minor parties infringes upon its First and Fourteenth Amendment right of free association in two ways. First, the restriction prevents the Party from nominating the standard bearer who the Party thinks will "most effectively advance [its] program and platform." Second, the challenged election laws deprive the Patriot Party of an opportunity to "fuse" its votes with those of a major party and thereby to make inroads into the political process. We consider these alleged burdens in turn.

An "antifusion statute" that prevents a political party from nominating its candidate of choice burdens a political party's First and Fourteenth Amendment rights. The Supreme Court has recognized that "[f]reedom of association also encompasses a political party's decisions about the identity of, and the process for electing, its leaders." Eu, 489 U.S. at 229-30

(citing Democratic Party of the U.S. v. Wisconsin, 450 U.S. 107, 123-24 (1981) (State cannot dictate process for selecting delegates to national convention) and Cousins v. Wigoda, 419 U.S. 477 (1975) (State cannot dictate who may sit as convention delegate)).  In Eu v. San Francisco County Democratic Cent. Comm., for example, the Court reviewed the constitutionality of California election laws that, inter alia, prohibited the governing bodies of various political parties from officially endorsing candidates in their own party primaries.  489 U.S. at 216.  The Court stated that

> [f]reedom of association means not only that an individual voter has the right to associate with the political party of her choice, . . . but also that a political party has a right to "identify the people who constitute the association," . . . and to select a "standard bearer who best represents the party's ideologies and preferences."

Id. at 224 (emphasis added) (citations omitted).  The Court recognized that the State's ban on endorsement by the party leadership was "clearly a restraint on the right of association," id. at 225 (citing Citizens Against Rent Control/Coalition for Fair Housing v. Berkeley, 454 U.S. 290, 296 (1981)).  It held therefore that because the state ban on party endorsements burdened free speech and free association, it could survive constitutional scrutiny only if it served a compelling governmental interest.  Id. at 225.

Dicta from Tashjian v. Republican Party of Connecticutalso indicates that political parties have a protected interest in selecting their own candidates, even if the nominee is not a party member.  The Court explained:

> Were the State to . . . provide that only Party members might be selected as the Party's chosen nominees for public office, such a prohibition of potential association with nonmembers would clearly infringe upon the rights of the Party's members under the First Amendment to organize with like-minded citizens in support of common political goals.

479 U.S. at 215; see also id. at 235-36 (Scalia, J., dissenting) ("Nor is there any question of restricting the ability of the Party's members to select whatever candidate they desire").

Like the state election laws in Eu and the hypothetical restriction in Tashjian, the Pennsylvania election laws prohibit a political party from associating with its candidate of choice.  Eshenbaugh was the Patriot Party's chosen standard bearer, and he was willing to serve as the Party's candidate.  Nevertheless, Pennsylvania's election laws denied the Party the right to nominate him.  By denying the Patriot Party the right to choose its standard bearer, the Pennsylvania election laws burdened the Party's right of free association.  See Eu, 489 U.S. at 229-30 (citing Democratic Party of the U.S., 450 U.S. at 123-24 and Cousins, 419 U.S. 477); Tashjian, 479 U.S. at 215.

The fact that the state election law in this case prevented the Patriot Party from nominating only a handful of candidates (those who had already sought the nomination of other

political parties) does not necessarily lessen the burden on the Party's associational rights. In order to assess this burden, we must look to the actual effect that the restriction will have on the party. An analogy to Norman v. Reed illustrates this point. In Norman, the Supreme Court reviewed an Illinois decision that barred appellees from appearing on the ballot in a Cook County election as members of the Harold Washington Party ("HWP"). 502 U.S. at 282. State law prohibited appellees from using the HWP name in Cook County because they had already used that name to establish a party in Chicago. Id. at 286-87. The state court decision, if upheld, would thus have prevented a political party already established in one locality from branching into other parts of the state under the same name.

The Supreme Court reversed the state court decision and held that the court's application of the Illinois law violated the HWP's First Amendment right of free association. Id. at 290. Even though the statute prevented new political parties from using only a handful of names (those names adopted by preexisting parties), the Court looked to the actual effect that the restriction would have on the HWP. According to the Court, the state court's "Draconian construction of the statute would obviously foreclose the development of any political party lacking the resources to run a statewide campaign." Id. at 289.

Thus, the fact that the restriction in Norman was so narrowly tailored that it prevented a political party from choosing only the few names that had already been chosen by other political parties was not dispositive. The Court looked instead to the effect that the law would have on the HWP's efforts to organize within the state. Likewise, the fact that the Pennsylvania laws prevent minor political parties from choosing only a few candidates is not dispositive. The critical issue, rather, is the effect of the laws on the ability of minor parties to participate meaningfully in the political process. See William R. Kirschner, Note, Fusion and the Associational Rights of Minor Political Parties, 95 Colum. L. Rev. 683, 699 (1995). As the Court of Appeals for the Eighth Circuit has observed, the "simplistic view that the [minor party] can just pick someone else [to be its candidate] does not lessen the burden on the [minor party's] right to nominate its candidate of choice." Twin Cities, 73 F.3d at 198 (citing Norman, 502 U.S. at 289). Because Pennsylvania's election laws prevent the Patriot Party from nominating its standard bearer of choice, those laws place a cognizable constitutional burden on the Party's right to free association.

The Patriot Party next argues that in addition to nullifying its choice of candidate, Pennsylvania's statutory ban on cross-nomination burdens the Party's ability to build an effective political organization. Although most states ban cross-nomination directly or indirectly, ten states, including New York, have a tradition of allowing minor parties to appear on the ballot and "fuse" votes with major parties. See Kirschner, supra at 683, 685 nn.13-14. In these states, minor parties have exerted considerable and sometimes decisive influence on the outcome of local, state, and national elections. Id. at 683,

700-04.  At least one historian has documented that in the late nineteenth century, fusion "helped to maintain a significant third party tradition by guaranteeing that dissenters' votes could be more than symbolic protest, that their leaders could gain office, and that their demands might be heard."  Peter H. Argersinger, "A Place on the Ballot":  Fusion Politics and Antifusion Laws, 85 Am. Hist. Rev. 287, 288-89 (1980).

A brief explanation of vote fusion demonstrates its importance to minor parties.  See Twin Cities, 73 F.3d at 197-98; Kirschner, supra at 687.  In the typical "winner takes all" election, a party's electoral success depends upon its ability to win the election or to contribute meaningfully to a candidate's victory.  Minor parties are usually unable to command sufficient votes to win the general election on their own.  Therefore, even voters who support the minor party's platform are reluctant to "waste" votes on minor party candidates perceived as having no serious chance of winning.  As the Court of Appeals for the Eighth Circuit has observed, individuals who support a minor party are confronted with a no-win proposition; they may "cast their votes for candidates with no realistic chance of winning, defect from their party and vote for a major party candidate who does, or decline to vote at all."  Twin Cities, 73 F.3d at 199.

Cross-nomination allows voters to cast their vote for a minor party without "wasting" their vote on a candidate with no prospect of winning the election.  In states that allow cross-nomination, several parties may nominate the same candidate.  A voter simply casts his vote for the candidate on any one of the party lines.  The general election votes that the candidate receives on each party line are added together to determine the winner.  For example, if the Patriot Party had been allowed to cross-nominate Eshenbaugh for school director, Eshenbaugh would have been permitted to add the votes that he received on the Democratic and Patriot Party lines and count all of those votes toward his election (just as Pennsylvania allowed the three candidates nominated by both major parties to combine the votes they received on each major party line).  An individual casting his vote on the Patriot Party line could, therefore, register his support for the Patriot Party platform without "wasting" his vote on a third party candidate who stands little chance of being elected.  The Patriot Party notes:

The most vivid example of fusion's benefits for minor parties occurs where a candidate is elected to office as the nominee of two parties, one major and one minor, and the margin of victory is smaller than the number of votes the candidate received on the minor party's line.  The resulting tally . . . demonstrates that the minor party's support was crucial.

Appellant's Brief at 6.

By thus demonstrating its electoral appeal, the minor party may win recognition for its policy positions as well as increased support from the electorate.  If significant numbers of voters cast ballots for a major party candidate on a minor party line, the candidate may infer that voters like the candidate's position on issues that the minor party has raised.  The more

apparent popularity of the minor party's platform would enhance its standing with candidates and with voters and allow the minor party to compete more effectively for votes.

Moreover, minor political parties are not the step-children of the American political process.  Core First and Fourteenth Amendment principles protect their rights to organize and to compete for votes.  See, e.g., Williams v. Rhodes, 393 U.S. 23, 31-32 (1968) (noting that laws that give "established parties a decided advantage over any new parties struggling for existence" burden right to associate).  In a line of cases including Williams v. Rhodes, Anderson v. Celebrezze, and Norman v. Reed, the Supreme Court struck down statutes or practices that unnecessarily burdened the ability of minor political parties to participate in the political process.

In Williams, the Court reviewed state election laws that made it "virtually impossible for any party to qualify on the ballot except the Republican and Democratic Parties."  393 U.S. at 25.  The Court found that the election laws substantially burdened both the right to vote and the right to associate and that their application only to minor parties resulted in a denial of equal protection of the laws.  Id. at 30-31.  In striking the challenged law, the Court expounded a principle that guides our analysis:

> There is, of course, no reason why two parties should retain a permanent monopoly on the right to have people vote for or against them.  Competition in ideas and governmental policies is at the core of our electoral process and of the First Amendment freedoms.  New parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past.

Id. at 32.

The principle that the political process should be open to new parties was vindicated again in Anderson v. Celebrezze, 460 U.S. 780 (1983).  In Anderson, a state statute threatened to prevent independent presidential candidate John Anderson from appearing on the Ohio ballot.  The statute required independent candidates to file nominating petitions several months before candidates of political parties were required to file their documentation.  460 U.S. at 782-83.  The Supreme Court found that the Ohio law effectively prevented late-emerging candidacies outside the major parties and burdened independent voters in the gathering of signatures.  Id. at 792.  The Court noted that

> it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint . . ..
>
> A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment.  It discriminates against those candidates and--of particular importance--against those voters whose political preferences lie

outside the existing political parties.

Id. at 793-94 (emphasis added) (citing Clements v. Fashing, 457 U.S. 957 (1982)).  The Court found that the election laws interfered with the ability of Ohio's independent voters to "enhance their political effectiveness as a group" and thereby "threaten[ed] to reduce diversity and competition in the marketplace of ideas."  Id. at 794.

The core First Amendment principles originally expounded in Williams and refined in Anderson extend to this case.  By preventing cross-nomination and fusion, Pennsylvania's election laws burdened the Patriot Party's ability to choose a candidate and to organize and gain influence in the political system.  The Party was prohibited by law from associating with Eshenbaugh, despite the fact that Eshenbaugh was the Party's first choice to be its candidate.  It was also prohibited from forming a consensual political alliance, which would have eliminated the "wasted" vote problem and allowed the Party to demonstrate its true electoral strength.  Of course, the Party was still free to organize and to nominate a candidate who had not been nominated by another political party, but by imposing its election requirements, the Department undeniably burdened the Patriot Party's right to associate.

The burden imposed by the Pennsylvania election laws is compounded by the fact that Pennsylvania permits the two major parties to cross-nominate candidates.  This additional burden is an important distinction between this case and Twin Cities.  In Twin Cities, Minnesota imposed a ban on fusion by all parties.  Thus, minor parties suffered only from the disparate impact of the across-the-board ban.  The ban on fusion in this case, however, applies to minor political parties only.  See 25 Pa. Stat. Ann. § 2870(f).  Therefore, the Pennsylvania election laws, unlike the Minnesota laws, discriminate on their face, as well as in their impact on major and minor political parties.

As a result of this facial discrimination against minor parties, the effects of the law are even more striking, with significant ramifications for the Patriot Party's right of free association.  When the major parties cross-nominate a candidate, as they did in the school board election, a minor party candidate will be required to attract enough votes on the minor party line alone to defeat a major party candidate who is allowed to aggregate the votes that he receives on both major party lines.  Although this argument goes more directly to the Patriot Party's equal protection claim, see infra Part IV, Anderson reminds us that "a burden that falls unequally on new or small political parties" also impinges on associational choices protected by the First Amendment.

In defense of the statutes, the Department averred at oral argument that because Pennsylvania's election laws allow cross-filing by the major political parties in races for three local offices only, the restriction on cross-nomination by minor political parties at most imposes a minimal burden on the Patriot Party's free association rights.  Given the relatively minor status of these offices in the state political structure as a whole, the Department argued, any burden on the Patriot Party's

First and Fourteenth Amendment right of free association must be correspondingly minor.

Based on our reading of Norman, we reject this argument. In Norman, the Court recognized that minor political parties must often establish themselves at the local level, and it characterized as "Draconian" a state court ruling that would have "foreclose[d] the development of any political party lacking the resources to run a statewide campaign." Norman, 502 U.S. at 289. Thus, the fact that an election law's effects are limited in scope is not dispositive. Our inquiry focuses on the practical and legal barriers that the law erects for minor political parties seeking to establish themselves as viable political alternatives to the major parties.

The Patriot Party seeks to cross-nominate a major party candidate in a local election so that it can demonstrate the popularity of its platform in an election undiluted by the major parties' organizational dominance. Like Illinois's restriction on using the HWP name, Pennsylvania's ban on fusion may inhibit a minor party's transition from fledgling political movement to statewide political organization. See id. Thus, this narrow application of the prohibition on cross-nomination does not eliminate the burden that Pennsylvania's election laws place on the rights of minor parties.

The two courts of appeals that have addressed this issue have split on the result. On facts similar to those in this case, the Eighth Circuit Court of Appeals held that laws preventing cross-nomination by minor parties severely burden core First and Fourteenth Amendment rights of free association:

> As in Norman, the burden here is severe because
> Minnesota's laws keep the [minor party] from developing
> consensual political alliances and thus broadening the
> base of public participation in and support for its
> activities. History shows that minor parties have
> played a significant role in the electoral system where
> multiple party nomination is legal, but have no
> meaningful influence where multiple party nomination is
> banned.

Twin Cities, 73 F.3d at 199 (citing Kirschner, supra at 700-04). As noted above, the burden on the Patriot Party's right of association in this case is even heavier than the burden imposed in Twin Cities because unlike Minnesota, Pennsylvania allows cross-nomination by the major parties. See Anderson, 460 U.S. at 793-94.

The Seventh Circuit Court of Appeals, however, has held that a "ban on multiple party nominations does not burden the associational rights of political parties . . .." Swamp, 950 F.2d at 386. The court argued that "[a]llowing minor parties to leech onto larger parties for support decreases real competition; forcing parties to chose [sic] their own candidates promotes competition." Id. at 385. Judges Ripple, Posner, and Easterbrook dissented from the Seventh Circuit's refusal to grant rehearing en banc in Swamp.

We note, finally, that burdens on minor political parties translate directly into burdens on individual voters.

The ban on cross-nomination burdens the associational rights of a voter who supports a minor party platform but recognizes that his vote will be a political nullity unless he casts it for a major party candidate.  We do not believe that the First Amendment imposes an affirmative obligation on states to maximize support for minor political parties.  But in this case, a vote cast for a party outside the current political mainstream is burdened by more than the minor party's lack of political support.  The Pennsylvania election code has erected an artificial barrier that prevents a minor party from forming consensual political alliances, and individual supporters of the minor party ultimately bear the burden.

In light of relevant Supreme Court precedent, the history of fusion, and the practical effect of the challenged Pennsylvania laws on the Patriot Party's political development, we find that 25 Pa. Stat. Ann. §§ 2936(e) and 2911(e)(5) severely burden the Patriot Party's First and Fourteenth Amendment rights of free association.  See Twin Cities, 73 F.3d at 198-99.  Pennsylvania, therefore, must demonstrate that these laws are narrowly tailored to serve a compelling state interest.  Norman, 502 U.S. at 289; Eu, 489 U.S. at 222.

B.  Pennsylvania's Interest in Banning Cross-Nomination

The Supreme Court recognizes that a state has a "compelling interest in preserving the integrity of its election process."  Eu, 489 U.S. at 231 (citing Rosario v. Rockefeller, 410 U.S. 752, 761 (1973)).  "As a practical matter," furthermore, "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic process . . .."  Storer v. Brown, 415 U.S. 724, 730 (1974).  To this end, states necessarily have adopted comprehensive election codes, id., and "the State's important regulatory interests are generally sufficient to justify reasonable, nondiscriminatory restrictions."  Anderson, 460 U.S. at 788 (footnoted omitted).

Wolosik and the Department of Elections argue that the challenged Pennsylvania election laws further four important state interests:  (1) preventing "sore loser" candidacies; (2) preventing individual candidates from "monopolizing" the ballot and causing voter confusion; (3) preventing a candidate from "bleed[ing] off votes of independent voters to bolster his or her major party endorsement"; and (4) encouraging new candidates to run as independents.  These justifications do not bear scrutiny.

The district court held that the challenged Pennsylvania laws are justified as a means to prevent "sore loser" candidates from carrying an intraparty squabble into the general election.  Patriot Party, slip op. at 9-11 (finding Patriot Party's argument represents "nothing more than a 'sore loser' situation").  "Sore losers" are candidates who lose a major party primary but insist on running on a minor party ticket in the general election.  In Storer v. Brown, the Supreme Court considered a California election law that denied a place on the general election ballot to any independent candidate who voted in the immediately preceding major party primary or registered affiliation with a political party at any time within one year

prior to the immediately preceding primary.  Storer, 415 U.S. at 726.  The Court upheld the restriction, noting that it works against independent candidates who might run against a party's candidate merely to vindicate their own "short-range political goals, pique, or personal quarrel."  Id. at 735.  Thus the restriction helped to prevent "splintered parties and unrestrained factionalism" by prohibiting unsuccessful primary candidates from running as independents in the general election.  Id. at 736.

The district court held in this case that the Pennsylvania election laws, like the California election laws challenged in Storer, serve an important state interest in preventing sore loser candidacies.  We do not agree.  The challenged laws, as applied in this case, did not prevent a "sore loser" candidacy.  Eshenbaugh was nominated as the Democratic candidate and was going to run in the general election regardless of the Patriot Party nomination.  Eshenbaugh did not run merely as an embittered loser of the Republican primary; he was the Democratic Party's candidate for office.  An individual is not a "sore loser" when he has in fact won a major party primary and runs in the general election as the standard bearer for a major party.  If Eshenbaugh's unsuccessful quest for the Republican nomination had involved him in a Republican intraparty squabble, nothing in the Pennsylvania laws would have prevented him from carrying that dispute into the general election once he secured the Democratic nomination.  Preventing the Patriot Party from endorsing the major party candidate in this case could do little to limit factionalism and intraparty disputes in the manner contemplated by Storer.

The Pennsylvania election laws prevent sore loser candidacies insofar as they prevent a candidate who failed to win either major party primary from running as a minor party candidate in the general election.  The Pennsylvania laws are overbroad for this purpose, however, and they could easily be more narrowly tailored to achieve the state's asserted goal of averting sore loser candidacies.  When an individual runs as the nominee of a major party, he can hardly be accused of making the general election ballot a "forum for continuing intraparty feuds" in the manner that concerned California in Storer.  415 U.S. at 735.

We note also that the sore loser justification could not support the sweeping ban on cross-nomination between minor parties that is now in place.  If an individual runs for and wins one minor party nomination only, the sore loser argument does not explain why that same individual should not be permitted to accept a cross-nomination from another minor party, or, for that matter, from a major party.  So long as the minor party candidate did not recently lose a primary or participate actively in another political party, the logic of Storer would not apply to the minor party candidate's acceptance of a cross-nomination by another major or minor party.

The Department also attempts to justify the contested election laws as a means to prevent multiple parties from nominating the same candidate.  The Department argues that a

proliferation of minor parties on the ballot would confuse voters and clog the state's election machinery.  Cf. Bullock v. Carter, 405 U.S. 134, 145 (1972) (state has legitimate interest in avoiding voter confusion); Tashjian, 479 U.S. at 221 (same).  But cf. Tashjian, 479 U.S. at 218 (noting that administrative economy and convenience do not necessarily justify infringement of First Amendment rights).

As a factual matter, there is no evidence in the record to support the proposition that myriad small parties will "clog" the ballot if cross-nomination is permitted.  In Williams v. Rhodes, Ohio argued that election laws severely restricting minor party access to the ballot were necessary to prevent large numbers of parties from clogging the ballot and confusing voters.  393 U.S. at 33.  The Supreme Court observed that

> the experience of many States . . . demonstrates that no more than a handful of parties attempts to qualify for ballot positions even when a very low number of signatures, such as 1% of the electorate, is required.  It is true that the existence of multitudinous fragmentary groups might justify some regulatory control but . . . at the present time this danger seems to us no more than "theoretically imaginable."  No such remote danger can justify the immediate and crippling impact on the basic constitutional rights involved in this case.

Id. (footnotes omitted).

We believe that this reasoning applies here.  The Department has presented no evidence to indicate that fusion is likely to produce a crippling proliferation of minor parties.  See Kirschner, supra at 683-85 (describing New York's successful experience with cross-nomination).  Furthermore, Pennsylvania retains the authority to set reasonable threshold requirements for parties seeking admission to the ballot.  See Illinois Elections Bd. v. Socialist Workers Party, 440 U.S. 173, 184-85 (1979) (citing Lubin v. Panish, 415 U.S. 709, 715 (1974) and Bullock, 405 U.S. at 145).  In short, the Department has offered no evidence to indicate that the threat of "ballot clogging" in this case is any more real than the imaginary threat that the Supreme Court rejected in Williams.

Although cross-nomination could theoretically lead to a proliferation of minor parties, it might also simplify the election ballot and increase the amount of information available to voters.  First, cross-nomination might simplify voter choices by reducing the absolute number of candidates appearing on the ballot.  As more minor parties choose to cross-nominate major party candidates rather than field candidates of their own, the number of different candidates appearing on the ballot might actually decline.  See discussion infra (discussing Department argument that cross-nomination will reduce number of candidates).  Thus, cross-nomination might actually lead to fewer candidates and a simpler ballot.

Second, if a minor party champions specific issues, that party's nomination of a major party candidate would signal to voters the minor party's belief that that candidate best

addresses the minor party's specific concerns.  Thus, minor parties may provide more focused scrutiny of a candidate's position on issues of importance to voters.  We are chary of policies that restrict voter options or information in the name of simplicity and orderly administration.  As the Supreme Court said in Anderson:

> A state's claim that it is enhancing the ability of its citizenry to make wise decisions by restricting the flow of information to them must be viewed with some skepticism.  As we observed in another First Amendment context, it is often true "that the best means to that end is to open the channels of communication rather than to close them."

460 U.S. at 798 (footnote omitted) (quoting Virginia Pharmacy Bd. v. Virginia Citizens Consumer Council, Inc., 425 U.S. 748, 779 (1976)); Eu, 489 U.S. at 228; Tashjian, 479 U.S. at 220-222 ("The State's legitimate interests in preventing voter confusion and providing for educated and responsible voter decisions in no respect 'make it necessary to burden [a Party's] rights.'") (quoting Anderson, 460 U.S. at 221-22).  We are not, therefore, persuaded by the Department's arguments concerning ballot clogging and voter confusion.

The other two explanations that the Department proffers to justify the ban on cross-nomination are even less persuasive.  The Department argues first that the ban on cross-nomination prevents a candidate from "bleed[ing] off votes of independent voters to bolster his or her major party endorsement."  Pennsylvania apparently is concerned that cross-nomination would allow major party candidates to win minor-party votes that would otherwise have gone to minor party candidates.  Cf. Swamp, 950 F.2d at 386 (refusing to allow minor parties to "leech onto" larger parties for support for fear that practice will decrease real electoral competition).  This is not a question of candidates "bleeding off" minor-party votes, however; it is a voluntary transfusion of minor party support to the major party candidate.  Cross-nomination will not increase a major party's share of minor party votes unless the minor party voluntarily nominates the major party candidate as its own.  It is under the current system that major party candidates "bleed off" minor party votes.  When cross-nomination is prohibited, individuals who do not want to "waste" their votes may feel compelled to vote for a major party candidate--even if they support the minor party's platform.

Finally, the Department argues that "Storer and the Pennsylvania Election Code recognize[] a public policy of encouraging new candidates to run as independents and discourage[] a situation where one candidate could accept a major party nomination and several other minor party nominations thereby monopolizing the ballot."  The Department argues that cross-nomination could allow a major party candidate to reduce the support available for competing independent candidates by accepting several minor party nominations.  This hypothetical reduction in the support available for minor party candidates would presumably reduce the number of minor party candidates on

the ballot.  This argument sets forth no compelling state interest, and the Department's reliance on Storer is misplaced.

Storer has little, if anything, to say about the importance of encouraging new candidates to run as independents. See Storer, 415 U.S. at 732 (noting states' authority to preventcandidates from running in general election).  The Supreme Court made clear in Tashjian that Storer was primarily concerned with protecting political parties from external threats.  Tashjian, 479 U.S. at 224.  Storer was meant to "prevent the disruption of the political parties from without, and not, as in this case, to prevent the parties from taking internal steps affecting their own process for the selection of candidates."  Id.  Thus, Storeris simply inapposite here.

Furthermore, the Department has not demonstrated that a minor party's cross-nomination of a willing major party candidate would threaten to disrupt political parties in any way.  A minor party need not nominate a major party candidate and a major party candidate need not accept the nomination.  See discussion, supranote 4. The availability of cross-nomination as an option would not prevent minor parties from nominating and supporting their own distinct candidates if they chose to do so.  Pennsylvania has not demonstrated how the possibility of a consensual political alliance would threaten political parties from without or otherwise implicate the concerns outlined in Storer.  As we explained, supra, this is not a "sore loser" situation.

The Department's argument is also undermined by the fact that Pennsylvania permits major parties to cross-nominate candidates.  If the Commonwealth bans cross-nomination by minor parties to encourage new candidates to run for office, it should logically prohibit cross-nomination by major parties for the same reason.  An across-the-board ban on cross-nomination would require the major parties to nominate their own candidates, thus increasing the number of candidates in the field and the level of electoral competition.  The Commonwealth has offered no reason for this distinction between major and minor parties.

We therefore find unpersuasive each interest that the Department has offered to justify its ban on cross-nomination by minor parties.  The Department bears the burden of demonstrating that the challenged election laws are narrowly tailored to protect a compelling state interest.  Because a more narrowly tailored law would prevent sore-loser candidacies, this case falls outside the ambit of Storer.  The Department's other asserted interests are either unsupported by the record or insufficient to justify an outright ban on cross-nomination by minor parties.  State regulation of cross-nomination might be appropriate in some circumstances, but the Department has not carried its burden in this case.  Thus, we hold that Pennsylvania's prohibition of cross-nomination by minor political parties violates the Patriot Party's right of free association.

## IV.  Equal Protection of the Laws

The Pennsylvania election code facially discriminates between major and minor parties.  The challenged statutes, 25 Pa. Stat. Ann. §§ 2936(e) and 2911(e)(5), operate to prevent cross-nomination by minor parties, while 25 Pa. Stat. Ann. § 2870(f)

allows the major parties to cross-nominate candidates for school director and other local offices. The Patriot Party alleges that this disparate treatment also violates the Party's Fourteenth Amendment right to equal protection of the laws because it violates a non-discrimination principle enunciated by the Supreme Court in Williams v. Rhodes. See 393 U.S. at 32. Because neither Twin Cities nor Swamp involved a ban on cross-nomination that facially discriminated against minor parties, we examine for the first time in a fusion case the issues presented by the Patriot Party's equal protection claim.

The district court held that Pennsylvania's election laws do not violate the Patriot Party's right to equal protection. Patriot Party, slip op. at 11. The court, applying the same balancing test that it applied to the free association claim, concluded that the "defendants' legitimate interest in regulating [the] ballot and election process justifies the limited restraints placed upon plaintiff by the challenged provisions of the Election Code." Id. Appellees assert that the laws should be subject to rational basis review because they do not create an "invidious, arbitrary, or irrational" classification and do not apply to a suspect class. They argue that because the classification is rationally related to a legitimate government interest in regulating its ballot, it does not violate the Fourteenth Amendment.

The Supreme Court's major precedent concerning the equal protection rights of political parties is Williams v. Rhodes, 393 U.S. 33 (1968). In Williams, Ohio election laws made it virtually impossible for new or small political parties to be placed on the state ballot for the selection of presidential and vice presidential candidates. Id. at 24. Thus, the challenged laws violated the constitutional guarantee of equal protection because they "[gave] the two old, established parties a decided advantage over any new parties struggling for existence and . . . place[d] substantially unequal burdens on both the right to vote and the right to associate." Id.

The Court characterized the nature of the equal protection burden imposed by the Ohio laws from the perspective of both voters and minor political parties. First, the Court noted that the election laws placed an unequal burden on voters who supported new or small political parties because those voters could not cast an effective vote for their party of choice. Id. at 31. Second, the election laws placed an unequal burden on minor political parties themselves because they were excluded from the ballot and thereby denied an equal opportunity to win votes. Id. The State election laws burdened protected constitutional rights because they operated to "stifle the growth of . . . new parties working to increase their strength from year to year." Id. at 32.

Against these burdens, the Court weighed Ohio's arguments in favor of its election laws. The State argued that its laws were necessary to promote the stability and integrity of the political system and for administrative efficiency. The Court examined each of the State's asserted interests in turn, and concluded that although states have broad powers to regulate

voting, Ohio's laws constituted "an invidious discrimination" in violation of the Equal Protection Clause.  Id. at 31-34.

From Williams, we can extrapolate the first principles and basic structure of our equal protection analysis.  It is clear that no State may pass a law regulating elections that violates the Fourteenth Amendment's guarantee of equal protection of the laws.  Williams, 393 U.S. at 29.  Of course, "the Equal Protection Clause does not make every minor difference in the application of laws to different groups a violation of our Constitution," id. at 30, but we will examine election laws to ensure that the distinctions or classifications that they create are not "invidious" under our precedent.  Id.; Patriot Party of Pennsylvania v. Mitchell, 826 F. Supp. 926 (E.D.Pa. 1993) (citing Clements, 457 U.S. at 967), aff'd, 9 F.3d 1540 (3d Cir. 1993).

In order to determine whether election laws violate the Equal Protection Clause, we must measure the totality of the burden that the laws place on the voting and associational rights of political parties and individual voters against the justifications that the State offers to support the law. Williams, 393 U.S. at 34.  As the Supreme Court stated in Williams: "In determining whether or not a state law violates the Equal Protection Clause, we must consider the facts and circumstances behind the law, the interests which the State claims to be protecting, and the interests of those who are disadvantaged by the classification."  Id. at 30 (footnote omitted).  Thus, our analysis of the Patriot Party's equal protection claim is similar in many respects to the balancing test that we applied to its free association claim.

It is undisputed that the Pennsylvania election laws treat major and minor parties differently.  Major parties that file nominating petitions and hold primaries are permitted to cross-nominate each other's candidates for school board, see 25 Pa. Stat. Ann. § 2870(f), while minor parties may not cross-nominate any candidates, see 25 Pa. Stat. Ann. §§ 2936(e) and 2911(e)(5).

The restriction in Williams, which prevented minor parties from appearing on the ballot, was undoubtedly a more severe burden on the rights of minor parties than the restriction imposed by the state election laws in this case.  The Pennsylvania laws do not prevent minor parties from nominating most individuals or from placing their candidate on the ballot; they merely prevent minor parties from nominating the few candidates already nominated by other parties.  But seediscussion supra at ___ (discussing Norman v. Reed) [Typescript at 14-15].

Nevertheless, we believe that Pennsylvania's decision to ban cross-nomination by minor parties and to allow cross-nomination by major parties constitutes the type of "invidious discrimination" prohibited by the Fourteenth Amendment. Pennsylvania's decision to ban some consensual political alliances and not others burdens individuals who support a minor party's platform because it forces them to choose among three unsatisfactory alternatives:  "wasting" a vote on a minor party candidate with little chance of winning, voting for a second-

choice major party candidate, and not voting at all. This burden would be assuaged if minor political parties were accorded an equal right to cross-nominate willing major party candidates.

The ban on cross-nomination by minor political parties also infringes on the the equal protection rights of political parties themselves. The challenged election laws may prohibit a minor party from nominating its best candidate and from forming a critical type of consensual political alliance that would help it to build support in the community. Thus, the challenged laws help to entrench the decided organizational advantage that the major parties hold over new parties struggling for existence.

The ill effects of these laws are further magnified when the major parties elect to cross-nominate the same candidate, as they did in the school board election at issue. When the major parties cross-nominate a candidate, a minor party candidate must fight an uphill election battle against the combined strength of two well-organized and established major parties without even the prospect of forming its own ballot alliances. If a vote is "wasted" when it is cast for a minor party candidate running against two major party candidates, it is a fortiori wasted when the major parties unite behind one candidate. Such an arrangement is a significant burden on a minor party's right to equal protection of the laws.

Moreover, Pennsylvania imposes these unequal burdens on the right to vote and the right to associate without protecting any significant countervailing state interest. As already noted, the ban on cross-nomination by minor parties is overly broad if it is intended merely to prevent sore loser candidacies. The other interests asserted by the Department on behalf of the Commonwealth simply do not bear scrutiny. See discussion supra at ___-___ [Typescript at 26-36]. Furthermore, many of the Department's arguments concerning ballot transparency and voter choice are undermined by the fact that the Commonwealth allows cross-nomination by the major political parties.

Pennsylvania's election laws facially discriminate against minor political parties in a way that diminishes their ability to organize and to compete effectively in the political process. The Department offers no compelling justification for the Commonwealth's facially discriminatory laws. We hold, therefore, that these facially discriminatory laws create an "invidious classification" that violates the Equal Protection Clause of the Fourteenth Amendment.

V. Conclusion

The challenged election laws burden the Patriot Party's right of free association by preventing the Party from nominating the candidate of its choice. They also prevent the Party from fusing its votes with those of the major parties in order to maximize its appeal to voters and to build its political organization. Appellees assert no compelling state interest to justify the election laws as applied in this case, and Pennsylvania could easily achieve its asserted goal of preventing "sore-loser" candidacies with a more narrowly tailored law. Pennsylvania's ban on cross-nomination by minor political parties therefore violates the Patriot Party's First and Fourteenth

Amendment right of free association.

 The laws also violate the Fourteenth Amendment's guarantee of equal protection of the laws. They discriminate against minor parties and the voters who wish to support them without supporting a compelling or even a significant state interest.

 We therefore hold that the challenged Pennsylvania election laws, as applied in this case, constitute an unconstitutional burden on the Patriot Party's First and Fourteenth Amendment rights to free association and equal protection. We will therefore reverse the judgment of the district court, enter judgment for the Allegheny County Patriot Party, and remand the case to the district court for further proceedings consistent with this opinion.

Patriot Party of Allegheny County v. Allegheny County Department of Elections, No. 95-3385

GREENBERG, Circuit Judge, dissenting.

 I respectfully dissent. As the majority indicates, this appeal involves a challenge to Pa. Stat. Ann. tit. 25, §§ 2936(e) and 2911(e)(5) (1994) "as applied in this case to prevent the [Patriot] Party from nominating [Michael] Eshenbaugh" as a candidate for school director in the North Allegheny School District. Typescript at 5. Eshenbaugh cross-filed for the office in both the Democratic and Republican primaries. He won the first but lost the second. Thus, at the time that the Patriot Party as a minor party attempted to nominate Eshenbaugh as its candidate, he already was the Democratic candidate. Everyone agrees that the nomination was thus unlawful under Pennsylvania law as written.

 The majority invalidates the statutory bars to Eshenbaugh's nomination on First and Fourteenth Amendment grounds. It finds that the statutes "severely burden the Patriot Party's First and Fourteenth Amendment rights of free association." Typescript at 24. It also finds that the statutes "facially discriminate[] between major and minor parties" in violation of the Equal Protection Clause of the Fourteenth Amendment, because they preclude a minor party from participating in the cross-nomination of a candidate while allowing major parties to do so. Typescript at 34.

 The majority does not suggest that these First and Fourteenth Amendment problems require the invalidation of the statutes at issue without further analysis. Quite to the contrary, it balances the minor party's constitutional rights with the state's interests in precluding the cross-party candidacy in question here. It then finds that the state's interests do not justify the restrictions, and it thus "hold[s] that the challenged Pennsylvania election laws, as applied in this case, constitute an unconstitutional burden on the Patriot Party's First and Fourteenth Amendment rights to free association and equal protection." Typescript at 40.

 I believe that the methodology used by the majority in

its well-drafted and thoughtful opinion is correct. I dissent, however, because I believe that, as applied in this case, the statutes serve a compelling state interest. While the majority expresses concern that the Patriot Party's rights be protected, it acknowledges that it must consider countervailing interests. Under the Pennsylvania scheme, a voter in a primary election in which cross-filing is permitted, will know whether a candidate has cross-filed or at least that information will be available to the voter. Thus, the voters in the primary knew or could have known that Eshenbaugh was seeking both the Democratic and Republican nominations. That information could be very important to a particular voter, as many voters are partisan advocates of one or the other major political parties and only will vote for candidates from that party. Of course, voters have every right to that partisan approach. A voter in a primary may refuse to vote for a candidate who has cross-filed with another major party, choosing instead to vote for a "pure" Democrat or Republican.

To the partisan political voter, it might come as a shock to discover that he or she voted for a closet advocate of a minor political party. In short, while some people see merit in fusion tickets, others may be put off by them. I, of course, express no opinion on this political point. I, however, do express the opinion that the state has a compelling interest in ensuring that voters in primary elections not be deceived in the electoral process. In this case, a voter in the primary election in May 1993 for school director knew or could have known that Eshenbaugh was seeking to run as a Democrat and as a Republican and the voter could take or leave Eshenbaugh on that basis. If the statutes at issue in this case had been invalidated before the primary, what the voter could not also have known was that a vote for Eshenbaugh also would be a vote for the candidate of the Patriot Party. The majority sees merit in "increas[ing] the amount of information available to voters," typescript at 29, and so do I. The problem with the majority's approach is that it deprives the voter of the crucial information of knowing the identity of the political parties with which a candidate has an affinity.

The point I raise should not be shrugged off. Today we have single-issue political parties. A Democrat or Republican voter might be opposed completely to the ideology of a minor party but yet discover after the primary that his or her vote has contributed to the fortunes of the minor party by nominating its candidate to run as a Democrat or Republican as well. The Pennsylvania statutes preclude such stealth situations. The majority demonstrates its concern that a minor party be able to "build its political organization." Typescript at 3, 14. What it overlooks is that a partisan major party voter may not want his or her vote used to help the minor party in that effort.

I recognize that it reasonably could be argued that Pennsylvania could avoid the problem I identify by requiring minor parties to select their candidates prior to the primary election. Of course, such a condition would restrict the minor party's flexibility and would have problems of its own. In any

event, the possibility that a minor party could designate its candidate before the major party primary election does not affect my analysis. Rather, I take this case as it has been presented by the parties to this appeal and on the basis on which the majority decides it, which is whether the Pennsylvania statutes are unconstitutional "as applied in this case." Thus, I do not address the possibility that the Pennsylvania statutes might be unconstitutional if applied in a situation in which the minor party files its nominating papers before the primary for, even if they would be unconstitutional in that circumstance, they validly can be applied here. See Commonwealth v. The First School, 370 A.2d 702, 705-07 (Pa. 1977). Here the Patriot Party nominated Eshenbaugh after the primary, and he accepted its nomination at that time, and both the district court and the majority adjudicated the case on that basis and so do I.

I make one final point. I infer from the majority opinion that it believes that the result it reaches is dependent upon the circumstance that Pennsylvania permits major party cross-filing in school director elections. Certainly my inference is correct at least with respect to the majority's equal protection holding, as the majority identifies the disparate treatment of a minor as opposed to a major party in the statutory scheme that permits candidates to cross-file in major party primaries but not to file as both a major and minor party candidate.

Nevertheless, I do not see how the application of the free association rights the majority identifies can be cabined to elections in which the state permits some cross-filing. To the contrary, it seems logical to me that the majority's approach inevitably leads to the conclusion that Pennsylvania (and the other jurisdictions in this circuit) must permit cross-filing in all elections, so that following any primary election for any office, a minor party may nominate any willing major party candidate to be the minor party's candidate in that election. After all, why are the associational rights of the minor parties in any way dependent on the circumstance that a candidate could cross-file in the Democratic and Republican primaries?

For the foregoing reasons I respectfully dissent. In my view, the Pennsylvania statutes as applied in this case are constitutional. Furthermore, I believe that the majority opinion carries implications which could bring about fundamental changes in the election processes in Pennsylvania and the other jurisdictions in this circuit by judicial decision. We ought not to lay the foundation for such a development. If such changes are to come, let the legislatures bring them about.